1
2
3
4
5
6
7
8       **IN THE UNITED STATES DISTRICT COURT**
9       **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11   ROBERT P. BENYAMINI,                    CASE NO. CV F 05-00684 LJO GSA HC
12                    Petitioner,            **ORDER DENYING SECOND AMENDED**
                                             **PETITION FOR WRIT OF HABEAS**
13          vs.                              **CORPUS WITH PREJUDICE;**
                                             **DIRECTING CLERK OF COURT TO**
14   TERESA SCHWARTZ,                        **ENTER JUDGMENT FOR RESPONDENT;**
                                             **DECLINING ISSUANCE OF**
15                    Respondent.            **CERTIFICATE OF APPEALABILITY**
16   _____/
17
18          On April 18, 2005, Robert P. Benyamini ("Petitioner"), a California prisoner currently
19   represented by counsel, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant
     to 28 U.S.C. § 2254 ("Petition")[1] in the United States District Court for the Central District of California
20
     ("Central District").  On May 4, 2005, the Central District transferred the Petition to the United States
21
     District Court for the Eastern District of California ("Eastern District") pursuant to 28 U.S.C. § 2241(d),
22
     finding that Petitioner was convicted in the Stanislaus County Superior Court and that Petitioner was
23
     incarcerated at the California Medical Facility in Vacaville, both located within the Eastern District of
24
     California.  *See* 28 U.S.C. § 84(b).  On May 11, 2005, the Eastern District received the Petition.
25
            On July 15, 2005, pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United
26
27   _____
           [1]       Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
28   the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

1

1  States District Courts, the Magistrate Judge recommended that Claim One (incompetence to stand trial),

2  in part, and Claim Three (missing reporter's transcripts) of the Petition be dismissed for failure to raise

3  a cognizable federal claim, and that the entire Petition be dismissed without prejudice for lack of

4  exhaustion.  On September 26, 2005, Petitioner filed Objections.  On October 19, 2005, the Court

5  adopted in full the Magistrate Judge's Findings and Recommendations.

6      On July 18, 2006, Petitioner filed a First Amended Petition and Memorandum in Support thereof

7  ("FAP").  On July 20, 2006, Petitioner filed a motion to stay the proceedings and hold the FAP in

8  abeyance pending exhaustion of state remedies.  On July 27, 2006, the Magistrate Judge granted the

9  motion to stay.

10     On September 13, 2007, Petitioner filed a Second Amended Petition ("SAP") and Memorandum

11  of Points and Authorities in Support thereof ("SAP Memorandum").  On December 11, 2007, Teresa

12  Schultz ("Respondent") filed an Answer to the SAP.  On March 28, 2008, Petitioner filed a Traverse and

13  Exhibits in Support thereof ("Traverse Exhibits").  Thus, this matter is ready for decision.

14                    **PROCEDURAL HISTORY**

15     On August 15, 2002, a Stanislaus County Superior Court jury convicted Petitioner of assault with

16  a firearm (Cal. Penal Code § 245(a)(2)).  (2 Clerk's Transcript ("CT") 389; 1 Reporter's Transcript

17  ("RT") 276.)  The jury found true the personal use of a firearm (Cal. Penal Code § 12022.5) and the

18  infliction of great bodily injury (Cal. Penal Code § 12022.7).  (2 CT 389; 1 RT 276.)

19     On October 27, 2003, Petitioner filed a habeas petition, with two supplemental habeas petitions

20  on October 29, 2003, and November 6, 2003, in the California Supreme Court, alleging ineffective

21  assistance of counsel, inadequate prison conditions, insufficient evidence for conviction, and erroneous

22  sentencing enhancements.  (Lodged Doc. ("LD") 7.)  On November 12, 2003, the California Supreme

23  Court denied the habeas petitions without comment but with citation to *In re Dixon*, 41 Cal. 2d 756

24  (1953) and *People v. Duvall*, 9 Cal. 4th 464, 474 (1995).  (LD 8.)

25     On December 1, 2003, Petitioner filed a second habeas petition in the California Supreme Court

26  alleging inadequate prison conditions.  (LD 9.)  On December 23, 2003, the California Supreme Court

27  denied the petition without comment but with citation to *In re Swain*, 34 Cal. 2d 300, 304 (1949) and

28  *People v. Duvall*, 9 Cal. 4th at 474.  (LD 10.)

1        After finding Petitioner was competent to stand trial,[2] on January 22, 2004, the superior court

2    sentenced Petitioner to ten years in state prison.  (2 CT 389; 3 RT 539-40.)

3        Just prior to sentencing, on December 29, 2003, Petitioner filed a third habeas petition in the

4    California Supreme Court alleging insufficient evidence for conviction.  (LD 11.)  On October 13, 2004,

5    the California Supreme Court denied the petition without comment but with citation to *In re Dixon*, 41

6    Cal. 2d at 756, *In re Lindley*, 29 Cal. 2d 709 (1947), and *In re Swain*, 34 Cal. 2d at 304.  (LD 12.)

7        On January 22, 2004, Petitioner appealed his conviction to the California Court of Appeal

8    alleging that he was incompetent to stand trial and that the trial court erred in calculating pre-sentence

9    custody credits.  (LD 1.)  On April 18, 2005, Petitioner filed his federal Petition.  On September 22,

10   2005, the court of appeal affirmed Petitioner's judgment and sentence with a modification of custody

11   credits in a reasoned opinion.  (LD 4 at 19.)

12       On September 30, 2005, Petitioner filed a habeas petition in the Stanislaus County Superior

13   Court alleging insufficient evidence for conviction and judicial error in denying a motion for retrial.  (LD

14   13.)  On October 11, 2005, the superior court denied the petition in a reasoned opinion.  (LD 14.)

15       On October 7, 2005, Petitioner filed a second habeas petition in the Stanislaus County Superior

16   Court alleging factual error in the trial transcripts.  (LD 15.)  On October 18, 2005, the superior denied

17   the petition in a reasoned opinion.  (LD 16.)

18       On October 24, 2005, Petitioner filed a petition for review in the California Supreme Court

19   alleging that he was incompetent to stand trial.  (LD 5.)  On November 30, 2005, the California Supreme

20   Court denied the petition for review.  (LD 6.)[3]

21       On November 7, 2005, Petitioner filed a habeas petition in the California Court of Appeal

---

[2]    The Court postpones elaboration of the post-trial, pre-sentence hearings of Petitioner's competency for trial until the Factual Background discussion, *infra*.

[3]    Respondent did not provide the Court with the order and/or judgment of the California Supreme Court denying the petition for review.  *See* 28 U.S.C. § 2254 R. 5(d) ("The respondent must also file with the answer a copy of: . . . (3) the opinions and dispositive orders of the appellate court relating to the conviction or the sentence.").  Instead, Respondent attaches a copy of the docket from the California Appellate Courts Web site, which indicates that the California Supreme Court denied the petition for review on November 30, 2005.  (*See* LD 6.)  The Court takes judicial notice of the state appellate court records for Petitioner's case, which are available on the Internet at http://appellatecases.courtinfo.ca.gov.  *See Smith v. Duncan*, 297 F.3d 809, 815 (9th Cir. 2002).  Although it appears that the California Supreme Court summarily denied the petition for review, the docket does not indicate whether the supreme court listed any citations to California case law in its denial.  (*See* LD 6.)

1  alleging sentencing error.  (LD 19.)    On November 14, 2005, the court of appeal denied the petition

2  for: (1) unexplained delay, *In re Harris*, 5 Cal. 4th 813, 828 (1993), (2) failure to raise issues on direct

3  appeal, *In re Walker*, 10 Cal. 3d 764, 773 (1974), and (3) conclusory allegations with no citation to the

4  record, *People v. Duvall*, 9 Cal. 4th at 474.  (LD 20.)

5  On January 25, 2006, Petitioner filed a third habeas petition in the Stanislaus County Superior

6  Court alleging jury misconduct.  (LD 17.)  On January 27, 2006, the superior court denied the petition

7  for failure to raise the claim on direct appeal, citing *In re Dixon*, 41 Cal. 2d at 759.  (LD 18.)

8  On February 8, 2006, Petitioner filed a fourth habeas petition in the California Supreme Court.

9  *See* California Appellate Courts, http://appellatecases.courtinfo.ca.gov (last visited Nov. 19, 2008).  On

10  September 27, 2006, the California Supreme Court denied the petition without comment but with

11  citation to *In re Clark*, 5 Cal. 4th 750 (1993), *In re Swain*, 34 Cal. 2d at 304, *In re Lindley*, 29 Cal. 2d

12  at 709, and *In re Dixon*, 41 Cal. 2d at 756.  *See id.*

13  On August 28, 2006, Petitioner filed a fifth habeas petition in the California Supreme Court

14  raising all claims in the current federal SAP and an additional claim that the jury committed misconduct

15  and was exposed to extrinsic facts.  (LD 21.)  On February 21, 2007, the California Supreme Court

16  denied the petition without comment but with citation to *In re Clark*, 5 Cal. 4th at 750, *In re Waltreus*,

17  62 Cal. 2d 218 (1965), *People v. Duvall*, 9 Cal. 4th at 474, *In re Miller*, 17 Cal. 2d 734 (1941), *In re*

18  *Dixon*, 41 Cal. 2d at 756, and *In re Swain*, 34 Cal. 2d at 304.  (LD 22.)

19  On June 12, 2008, Petitioner filed a sixth habeas petition in the California Supreme Court.  *See*

20  California Appellate Courts, http://appellatecases.courtinfo.ca.gov.  On July 9, 2008, the California

21  Supreme Court denied the petition, apparently without comment or citation to authority.  *See id.*; *see also*

22  *supra* note 3.

23  **FACTUAL BACKGROUND**[4]

24  [Petitioner] and victim (V.) were acquaintances within the tightly knit Assyrian
     community in Modesto. In August 1999, V. and his friends were present during an

25  argument between [Petitioner] and another man. The altercation escalated into a fight
     between [Petitioner] and three men. V. watched the men beat [Petitioner]. Although V.

26

27  [4]    The Court adopts the factual background from the September 22, 2005, California Court of Appeal opinion

28  on direct review as a fair and accurate summary of the evidence presented at trial and during the post-trial competency
    proceedings.  *See* 28 U.S.C. § 2254(d)(2), (e)(1).

was not involved in the fight, he did nothing to intervene.

In September 1999, V. was at a vending truck with some friends. While V. was eating, someone approached him from behind, tapped him on the shoulder, and punched him in the face when he turned around. V. fell to the ground and three men kicked him in the head. V. watched [Petitioner] walk toward his truck and heard him say, "Payback's a bitch."

V. got up and grabbed a wooden stool. He threw the stool through [Petitioner's] truck window and walked away. He heard someone tell him to turn around. When he did, [Petitioner] shot him in the face.

On September 6, 2001, [Petitioner] was charged with and pled not guilty to assault with a firearm. (Pen. Code, §§ 245, subd. (a)(2).) [footnote omitted] It was alleged that [Petitioner] had personally used a firearm and inflicted great bodily injury on V. (§§ 12022.5, 12022.7.) After a four-day trial, on August 15, 2002, the jury found [Petitioner] guilty as charged and found true both allegations. [Petitioner] was remanded into custody.

On September 10, 2002, defense counsel informed the court he had a doubt as to [Petitioner's] mental competence, as follows:

> "Based on my conservations [sic] with [Petitioner] at the jail and his conduct when the verdict came in and then seeing the – including the [written] statement [by Petitioner] we just got today, I have a doubt as to his mental competence to understand the nature of the proceedings and to assist in his defense at this stage. And I conveyed that to [the prosecutor].... [B]ased on these observations and conversations of mine, I do have that doubt at this point, and I think under [section] 1368 that that question should be examined by an alienist."

The court suspended criminal proceedings and appointed Dr. Robin Schaeffer, a clinical psychologist, to evaluate [Petitioner's] mental status.

On September 27, 2002, Schaeffer submitted a report stating that he found [Petitioner] incompetent. Schaeffer concluded that, although [Petitioner] understood the nature of the proceedings, the roles of the various participants, and the nature of the crime of which he had been convicted, his mental status suggested he was unable to rationally assist counsel in his defense. He was frequently irrational, with indications of paranoid thought processes, and was unable to adequately attend to what was being communicated to him due to his flight of ideas, disjointed associations, and pressured speech. Schaeffer also interviewed [Petitioner's] father, Paul, who reported that [Petitioner] had mentally deteriorated after the beating he had suffered in August 1999. At first, [Petitioner's] reaction seemed to be a normal and legitimate response of anger and fear. But, as time passed, [Petitioner] began to fear everyone. He believed V. would come for him, and believed V. had entered the home and taken his lighter. [Petitioner] believed the C.I.A., F.B.I., and V. had planted listening devices around the house. He changed the locks to the house six times and put chairs in front of the doors at night to assuage his fears. [Petitioner's] paranoia also was directed at his father, whom he accused of stealing. Paul said [Petitioner] became a recluse for almost three years, lost his job, lost his friends and girlfriend, and virtually locked himself in the house. Paul did not know whether [Petitioner] used any illicit drugs that might have contributed to his mental deterioration. Paul said [Petitioner] was currently calling him from jail and claiming his attorney was working against him and was being paid by V. [Petitioner] accused Paul of cooperating with his enemies, although Paul was in fact paying for [Petitioner's] defense.

Schaeffer stated [Petitioner] was presently suffering from a mental disorder involving paranoia, possibly representing one or more of the following: a primary psychosis, a psychosis secondary to structural or functional organic brain damage, or psychosis associated with posttraumatic stress disorder. Schaeffer concluded [Petitioner]

5

was capable of understanding the nature and object of the proceedings against him but was not capable of assisting counsel in his defense.

On November 4, 2002, Schaeffer testified at the section 1368 competence hearing. In addition to a thorough explanation of his opinion of [Petitioner's] mental status, Schaeffer also explained on cross-examination that an issue of mental competence can arise at any time during the trial process because a person's mental status can change at any point in the proceedings. Alterations in mental status can occur for different reasons at different times. Furthermore, it was possible that [Petitioner's] change in mental status occurred and was manifested earlier and was not noticed until this late stage.

[Petitioner's] father, Paul, also testified. He explained that [Petitioner] had changed after his beating in August 1999. His initial fear developed into a gripping paranoia that visibly increased on a daily basis. He virtually imprisoned himself in the house out of fear, leaving only occasionally to go to the store. He repeatedly changed the locks to the house. He believed V. and his gang (who had assaulted him) were after him, then gradually came to believe the C.I.A. and F.B.I. were also involved. He began to suspect that Paul was not actually his father. He thought he could read Paul's mind. Since entering jail, [Petitioner] was generally irrational during his calls and visits with Paul. [Petitioner] would ramble on about how the deputies, his attorney, and Paul were all against him. He asked Paul to have the family dog's DNA checked because he suspected the dog was not theirs and had been bugged and placed in the house.

Paul explained the family had hoped to address [Petitioner's] personal problems in a private setting after [Petitioner] was tried and acquitted. They had hoped to hospitalize him at that time.

At the conclusion of the hearing, the court found [Petitioner] incompetent because he was unable to rationally assist his counsel in conducting a defense.

At the section 1370 hearing on December 19, 2002, the court reiterated that criminal proceedings were suspended and ordered [Petitioner] to be referred to the Central Valley Conditional Release Program, which recommended that [Petitioner] be committed to the Trial Competency Program at Atascadero State Hospital (ASH). [Petitioner] complained of his treatment at the jail and the court reassured him he would be transferred to the hospital as soon as possible. [Petitioner] requested bail but the court refused.

On February 6, 2003, [Petitioner] was admitted to ASH.[5] The delay in his admission was apparently due to a bed shortage at ASH. His initial, provisional diagnosis made that day suggested he might be suffering from a bipolar disorder, a psychotic disorder, and a cognitive disorder. The staff psychiatrist, Dr. Robert Wilson, stated in a March 11, 2003, report that it was the opinion of the treatment team at ASH that [Petitioner] manifested a mental illness or defect that might interfere with his ability to cooperate with an attorney in the preparation of a defense.

On March 27, 2003, after conducting seven days of neuropsychological testing of [Petitioner], Dr. Christine Mathiesen, a neuropsychologist, prepared a 13-page report in which she observed that [Petitioner's] performance generally indicated he put forth a complete effort and was not malingering. He exhibited poor cognitive flexibility, symptoms of thought disorder, paranoia, and possible delusions. His pattern of performance was not suggestive of central nervous system dysfunction from head injury, nor was it suggestive of chronic substance abuse. Mathiesen stated that the results of her evaluation suggested [Petitioner] did not suffer from a cognitive disorder and may not have abused substances, but that his presentation appeared primarily due to abnormal thought processes meeting the criteria for a psychotic disorder. Mathiesen was uncertain

---

[5]   [California Court of Appeal footnote 2:]  The record contains one reference to [Petitioner's] admission on February 16 rather than February 6, but we believe this single reference is inconsistent with the contents of the document itself and with the remainder of the record.

whether [Petitioner] could become competent to stand trial. She said he was cognitively equipped to learn and use trial-related material, but he could have difficulty with complex verbal ideas and appeared to be psychiatrically vulnerable to tangential, disorganized thinking, and possibly paranoia. Furthermore, his strong belief that he was being framed for the crime would likely interfere with his willingness to work with counsel. [Petitioner] appeared to have the cognitive functions necessary to comprehend information during meetings with counsel and court proceedings, but his poor cognitive flexibility and verbal skills could make it difficult for him to process the somewhat abstract trial-related information and to engage in flexible thinking and cogent decision making, both of which were potentially necessary to aid counsel in developing an effective approach.

On April 25, 2003, the medical director of ASH signed a certification of [Petitioner's] mental competence, and, on May 1, 2003, [Petitioner] was discharged from ASH. The discharge diagnosis, made by Dr. Lawhead, was that [Petitioner] was suffering from an adjustment disorder, malingering polysubstance dependence, and a personality disorder, with a history of head trauma and neck pain. On May 8, 2003, [Petitioner] was returned to ASH for another report, and, on May 9, 2003, the hospital's certification of [Petitioner's] competence was filed in court.

On June 4, 2003, the court found [Petitioner] competent and reinstated criminal proceedings.

On September 17, 2003, [Petitioner] filed a motion for reconsideration of the court's finding, based on the involuntary use of medication to maintain competence, pursuant to *Sell v. U.S.* (2003) 539 U.S. 166. At the hearing on September 19, 2003, the court heard testimony from Wilson, who had treated [Petitioner] during part of his stay at ASH. Wilson testified about the medication practices at ASH, and also testified about [Petitioner] specifically. He stated that [Petitioner] exhibited poor behavior from the time he arrived at ASH. He was threatening, hyperactive, overly verbal, assaultive, demanding, and difficult to redirect. Every effort was made to deal with him and improve his behavior. He was given the medication Depakote, often used for mania and bipolar disorder, to stabilize his mood because he was likely considered manic or bipolar upon his admission to ASH due to his behavioral problems. However, little benefit was had from the drug and Wilson came to see [Petitioner's] problem not as mania but as antisocial personality disorder. Twice, [Petitioner] was sedated to control his agitation and fighting.

Wilson said the staff found [Petitioner] to be a difficult patient from the start and there was consensus that he was going to be trouble. The staff hoped [Petitioner's] poor behavior upon his arrival was a manic episode that would pass quickly, but [Petitioner's] behavior actually worsened during his stay. More and more, he was fighting with and taunting patients, especially the lower-functioning ones who were, unlike [Petitioner], seriously mentally ill. He would mock them or touch them in ways they found offensive and altercations would erupt in the hallways. Some of these patients were larger than [Petitioner] and could have done him serious harm. Some were so delusional that they did not understand what was at stake and had nothing to hold them back from violently reacting to [Petitioner]. [Petitioner's] medication was not increased because the staff members were beginning to believe that [Petitioner] was trying to manipulate the lower-functioning patients for his own entertainment and that he did not care about their response.[6] As a result of the misconduct, [Petitioner] was physically restrained on occasion. [Petitioner's] poor behavior continued until he was discharged; he remained difficult for both staff and patients throughout his stay.

Wilson opined:

---

6       [California Court of Appeal footnote 3:]  At this point in Wilson's testimony, [Petitioner] interjected, "Getting beat up is entertaining?"

7

> "[W]e try to give people the benefit of the doubt as they come in. And I think it was appropriate to think that [Petitioner] may have had a bipolar disorder that could be rather quickly controlled, rather quickly leveled out. But in retrospect, I don't think he was ever not competent. I think he had a character disorder[,] personally, antisocial personality disorder from the beginning, and that he-he probably still does. That's a chronic condition. [¶] ... [¶] I think it was important to give him a trial [with Depakote] because that's one of the ways that we make diagnoses is [sic] by using a safe medication to see what the results are, because if they respond to that, that really is a point in favor of that diagnosis. I think it was important to try it. But in retrospect, I don't think it had any gain, initial effect."

Wilson explained that someone with a personality disorder, which was his assessment of [Petitioner], would not be incompetent to stand trial, although that person might be difficult to deal with. A person's intentional misconduct would not hinder competence. Wilson had spoken to Mathiesen but had not seen her report.

On cross-examination, Wilson stated he had not seen Mathiesen's report, which he believed might have been ordered by the psychologist on the admitting unit. When defense counsel suggested that Wilson did not factor Mathiesen's report into his diagnosis because he was unaware of her report, Wilson responded that he had spoken with Mathiesen about [Petitioner], but he had not seen her report. Defense counsel then requested a short break to allow Wilson to read Mathiesen's report.

At this point, the prosecutor asked the court whether it was going to receive testimony only on the issue of involuntary medication (*Sell v. U.S., supra,* 539 U.S. 166) or on the broader issue of [Petitioner's] competence. The court responded that the hearing was limited to the issue of involuntary medication under *Sell.* Defense counsel agreed it was appropriate to limit testimony to this subject.

Eventually, during the course of the hearing, defense counsel again addressed Mathiesen's report, which Wilson had now read. Counsel pointed to Mathiesen's finding that [Petitioner] put forth a complete effort in his performance (and thus was not malingering). Wilson replied that he also sometimes encountered a complete effort in his interviews with [Petitioner]. In addition, [Petitioner] sometimes insisted he was competent and other times insisted he was not. Sometimes he said he wanted to stay at the hospital to work on his case. Later, Wilson agreed that Mathiesen was of the opinion [Petitioner] suffered from a psychotic disorder. Wilson explained he had spoken to Mathiesen about [Petitioner] but not about her diagnosis, which he had not seen until that day in court.

At the hearing's conclusion, the court determined [Petitioner] had not been subjected to involuntary medication for the purpose of restoring his competence. The court again found [Petitioner] to be competent and denied the motion to medicate.

On September 19, 2003, [Petitioner] filed a motion for a new trial. And, on October 3, 2003, he filed a motion for reconsideration of the competence finding based on newly discovered evidence in ASH records, including the assessment by Mathiesen.

In preparation for the hearing, defense counsel requested that Schaeffer reevaluate [Petitioner]. Schaeffer interviewed [Petitioner] again, and he reviewed [Petitioner's] psychiatric records (approximately 750 pages) from ASH, his own earlier evaluation of [Petitioner], and the Wilson transcript from the September 17, 2003, hearing. As stated in his report dated November 19, 2003, Schaeffer believed [Petitioner] was not malingering, although he might have exaggerated his symptoms at times. Schaeffer again concluded [Petitioner] was capable of understanding the nature and object of the proceedings against him, but was not capable of assisting counsel in his defense. Schaeffer based these conclusions on [Petitioner's] clear presentation of a psychotic thought disorder and a severe disinhibition of impulses. Schaeffer stated that he agreed with the thorough, seven-day neuropsychological assessment by Mathiesen that

concluded [Petitioner] exhibited symptoms of thought disorder, suffered psychosis based on those symptoms, and needed further assessment in light of the severe head trauma associated with the onset of his symptoms. Schaeffer disagreed with the assessments of Wilson and another ASH professional, who both believed [Petitioner] was malingering and suffering from nothing more than an adjustment disorder and a personality disorder. Schaeffer also disagreed with Lawhead's discharge diagnosis. He further believed Mathiesen's evaluation had not been taken into consideration in these assessments by the other professionals.

Schaeffer stated that, in his opinion, [Petitioner's] behavior at ASH exhibited the symptoms of his mental illness, which was repeatedly expressed as a severe disinhibition of impulse control with both verbal and physical violence and aggressive sexual threats directed not only at other patients but also particularly at staff. Schaeffer believed the ASH records made it clear [Petitioner's] violent behavior was not willful bullying but rather true disinhibition resulting from mental illness. Schaeffer stated:

> "My clinical conclusion is that these behaviors, self-defeating because they were consistently responded to with [physical] restraint and restriction of privilege, and self-endangering when directed, as they often were, against other inmates who were bigger and stronger, are not 'willful misconduct' and not merely 'personality disorder' but clearly the result of major mental illness. In my opinion [Petitioner's] documented consistent inability to cooperate with and to rationally communicate with staff, as well as the 'short attention span' and 'difficulty in planning' attested to by Dr. Wilson, and the psychotic thought disorder found by Dr. Matthiesen [ sic ] following extensive neuropsychological evaluation, and the paranoia he expressed toward defense counsel which he expressed to me in my recent interview with him, all point to a present inability to assist counsel in his defense. In my opinion [Petitioner] could not be expected to maintain trial competence through the course of another court proceeding."

Schaeffer agreed with Mathiesen that [Petitioner] required further neurological assessment and also agreed that some of [Petitioner's] competence issues might be related to a possible brain injury from his assault in 1999.

On November 21, 2003, a hearing on the motions was held. The court received Schaeffer's recent report. Defense counsel argued the court should consider the entire history of the case, including Mathiesen's report and diagnosis. Counsel argued [Petitioner] had not been competent during trial and his incompetence had been deceptive to counsel because it was unusual. Counsel had initially believed [Petitioner] to be merely hard-headed. On November 25, 2003, the court denied the motions. (LD 4 at 2-10.)

## PETITIONER'S CLAIMS

1.   Petitioner was tried and sentenced while incompetent (SAP 5);

2.   Petitioner was denied the right to be present with counsel at all stages of the proceedings against him (*id.*);

3.   Petitioner was denied: (1) the right to confront and cross-examine the witnesses against him and (2) the due process and compulsory process rights to present a defense (*id.* 6);

4.   The prosecution's failure to turn over details of the shooting victim's plea agreement in another

1  case violated *Brady v. Maryland*, 373 U.S. 83 (1963), and a prosecutor assigned to another case

2  that explained the details of the plea agreement improperly vouched for the shooting victim's

3  credibility in violation of Petitioner's due process right to a fair trial (*id.*);

4  5.  Petitioner was denied the right to testify on his own behalf (*id.*);

5  6.  Ineffective assistance of trial and appellate counsel (*id.*); and

6  7.  The cumulative errors amounted to a violation of due process (*id.*).

7  **STANDARD OF REVIEW**

8  The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996,

9  Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is subject to its provisions.

10  *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997).  The standard of review applicable to Petitioner's

11  claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

12  (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant

13  to the judgment of a State court shall not be granted with respect to any claim that was

14  adjudicated on the merits in State court proceedings unless the adjudication of the claim–

15  (1) resulted in a decision that was contrary to, or involved an unreasonable

16  application of, clearly established Federal law, as determined by the Supreme

17  Court of the United States; or

18  (2) resulted in a decision that was based on an unreasonable determination of the

19  facts in light of the evidence presented in the State court proceeding.

20  28 U.S.C. § 2254(d).

21  Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of

22  state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the

23  time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  To determine

24  what, if any, "clearly established" United States Supreme Court law exists, the court may examine

25  decisions other than those of the United States Supreme Court.  *LaJoie v. Thompson*, 217 F.3d 663, 669

26  n.6 (9th Cir. 2000).  Ninth Circuit cases "may be persuasive."  *Duhaime v. Ducharme*, 200 F.3d 597, 598

27  (9th Cir. 2000).  On the other hand, a state court's decision cannot be contrary to, or an unreasonable

28  application of, clearly established federal law if no Supreme Court precedent creates clearly established

10

1   federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d

2   952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 654 (2006).

3      A state court decision is "contrary to" clearly established federal law if the decision either applies

4   a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result

5   the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8

6   (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is

7   contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by

8   § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of

9   the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court

10  decision contradicts them." *Early*, 537 U.S. at 8.

11     State court decisions which are not "contrary to" Supreme Court law may only be set aside on

12  federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly

13  established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S.

14  at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a State court decision that correctly identified the

15  governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case.

16  *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

17  However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show

18  that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537

19  U.S. at 24-25, 27. An "unreasonable application" is different from an "erroneous" or "incorrect" one.

20  *Williams*, 529 U.S. at 409-10; *see also Woodford*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 686

21  (2002).

22     A state court factual determination must be presumed correct unless rebutted by clear and

23  convincing evidence. 28 U.S.C. § 2254(e)(1). Further, a state court's interpretation of state law,

24  including one announced on direct appeal of the challenged conviction, binds a federal court sitting in

25  habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

26                                **DISCUSSION**

27                                 **Claim One**

28     In his first claim, Petitioner contends that he was incompetent during trial, and that there was no

1   evidence or support for the trial court's finding that he was competent.  (SAP 5, 10-22; SAP Mem. 3-

2   17.)[7]

3          Petitioner raised this claim before the California Supreme Court in his petition for review.  (LD

4   5).  Because the California Supreme Court summarily denied the petition for review (*see* LD 6), this

5   Court must "look through" the summary disposition to the last reasoned decision, that of the California

6   Court of Appeal on direct review (*see* LD 4).  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

7   In rejecting Petitioner's claim, the appellate court stated:

8                              **I. Competence to Stand Trial**
            [Petitioner] contends he was incompetent to stand trial because his mental
9      disorder prevented him from assisting in his defense. He argues the trial court's finding
       that he was competent was not supported by sufficient evidence and thus the court
10     abused its discretion by denying the motion for reconsideration and the motion for a new
       trial.
11          [Petitioner] asserts that the only evidence supporting the trial court's finding of
       competence was "Wilson's uninformed testimony that [Petitioner] had a personality
12     disorder rather than some form of psychosis." [Petitioner] argues other, more compelling,
       evidence clearly established he suffered from delusions and paranoia that prevented him
13     from effectively communicating with his attorney. He further asserts there was evidence
       he was afflicted with this mental disorder before, during, and after trial. He takes the
14     position that Wilson's opinion did not amount to substantial evidence in light of the
       overwhelming evidence he was suffering from a mental disorder that more likely than
15     not rendered him incompetent.
            We conclude there was substantial evidence – reasonable, credible, and of solid
16     value – which, when viewed in the light most favorable to the verdict, supported the trial
       court's finding of competence (*People v. Lawley* (2002) 27 Cal.4th 102, 131), and
17     therefore the trial court did not abuse its discretion by denying the motion for
       reconsideration of the competence finding and the motion for new trial (see *People v.*
18     *Williams* (1961) 194 Cal.App.2d 523, 524-526; *People v. Gallego* (1990) 52 Cal.3d 115,
       162-163).
19                                        **A.**
            "Trial of an incompetent defendant violates the due process clause of the
20     Fourteenth Amendment to the United States Constitution [citation] and article I, section
       15 of the California Constitution. Those protections are implemented by statute in
21

22          [7]     On November 17, 2008, Petitioner filed a document entitled "Submission of Supplemental Authority,"
     wherein he appears to add an argument that the trial court never conducted a formal hearing devoted to Petitioner's
23   competency during trial.  (*See* Subm. of Suppl. A. 2-3.)  To the extent Petitioner is raising an additional "procedural"
     incompetence claim—that the trial court should have held a hearing to determine whether Petitioner was competent, *see*
24   *Boyde v. Brown*, 404 F.3d 1159, 1165 n.6 (9th Cir. 2005)—rather than supplementing his "substantive" incompetence
     claim—that Petitioner was in fact not competent to stand trial, *see id.*—Petitioner is required to file a formal motion to amend
25   his SAP and either receive Respondent's written consent to amendment or the Court's leave.  *See* Fed. R. Civ. P. 15(a)
     (requiring consent or court's leave for amendment filed after responsive pleading served); L.R. 15-220.
26          Even assuming that this claim is properly raised, it is without merit because the trial court found Petitioner
     competent: (1) following a competency hearing on June 4, 2003 (*see* 1 CT 119, 124, 152; 2 CT 338; Rep.'s Suppl. Tr. 173);
27   (2) following a competency reconsideration hearing on September 19, 2003 (*see* 1 CT 173-74); and (3) following a second
     competency reconsideration hearing and motion for new trial hearing on November 21, 2003 (*see* 2 CT 385-86).  (*See*
28   *generally* LD 4 at 5-10.)

                                                12

California. A criminal defendant is incompetent and may not be 'tried or adjudged to punishment' if 'as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (§ 1367, subd. (a).) Section 1368 mandates a competency hearing if a doubt as to a criminal defendant's competence arises during trial. That may occur if counsel informs the court that he or she believes the defendant is incompetent (§ 1368, subd. (b)), or '[i]f during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant.' (§ 1368, subd. (a).)" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1281; accord, *Cooper v. Oklahoma* (1996) 517 U.S. 348, 354; *Medina v. California* (1992) 505 U.S. 437, 453.)

Although it arises in the context of a criminal trial, a competence hearing is a special proceeding, governed generally by the rules applicable to civil proceedings. (*People v. Lawley, supra,* 27 Cal.4th at p. 131.) A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence. (§ 1369, subd. (f); *People v. Medina* (1990) 51 Cal.3d 870, 881-886.) Once a defendant has been found competent to stand trial, a trial court need not suspend proceedings to reconsider its finding or to conduct a second competence hearing unless it "'"is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding. [Citations.]' [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 542-543 [no change in circumstance to justify second hearing]; *People v. Jones* (1991) 53 Cal.3d 1115, 1153-1154 [general assertion of defendant's worsening condition and inability to cooperate with counsel inadequate to justify second hearing].)

A defendant convicted when he is incompetent is entitled to a new trial. (*People v. Williams, supra,* 194 Cal.App.2d at pp. 524-526.)

**B.**

According to the evidence, [Petitioner] began to behave differently after he was assaulted in 1999. During trial in August 2002, defense counsel found [Petitioner] hard-headed, then later believed he might be incompetent. In Schaeffer's opinion, [Petitioner] was incompetent in September 2002. The medical personnel at ASH initially believed [Petitioner] suffered from a mental disorder and the assessment by Mathiesen in March 2003 supported that belief. However, over the course of [Petitioner's] stay at ASH, the medical personnel became increasingly convinced that [Petitioner] was suffering not from a mental disorder but from a personality disorder, and that his poor behavior was intentional misconduct, apparently committed for his entertainment at the expense of seriously mentally ill patients. His medication did not improve his poor behavior. He was certified as competent by ASH and discharged after about three months in May 2003. Schaeffer believed [Petitioner] was incompetent in November 2003.

We presume, and the record demonstrates, that the court heard and considered all the evidence regarding [Petitioner's] mental status, including that now relied upon by [Petitioner]. At least some of the medical personnel who treated and observed [Petitioner] at ASH during his three-month stay concluded that he was competent during trial and that his behavioral problems were due to a personality disorder and intentional misconduct rather than a mental disorder. Schaeffer's second report did not suggest that there had been a change of circumstances, only that there was a difference of professional opinion regarding [Petitioner's] mental status.[8] It had already been established that some professionals believed [Petitioner] had at some point suffered from a mental disorder that rendered him incompetent and some professionals, such as Wilson, believed he had never suffered from a mental disorder and thus had never been incompetent. Defense counsel had the opportunity to cross-examine Wilson on his diagnosis and his consideration of and his opinion of Mathiesen's conflicting diagnosis. The court could

---

8      [California Court of Appeal footnote 4:]  We also note that Schaeffer's report was directed to the subject of [Petitioner's] present mental competence.

properly assess the weight and persuasiveness of the findings and conclusions of the various professionals to determine whether [Petitioner] was competent to stand trial. The court apparently found more convincing the evidence that hospital physicians and staff who treated and observed [Petitioner] day and night over the course of three months, and who originally believed he might be suffering from a mental disorder but became increasingly convinced his poor behavior was volitional and personality-driven, until they determined that, despite his bad conduct, he was nevertheless competent to stand trial.

Moreover, the court was able to observe [Petitioner's] behavior during trial. (See *People v. Danielson* (1992) 3 Cal.4th 691, 727 [noting trial court is better able to determine facts surrounding defendant's competence than is a reviewing court] overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) As far as we can gather from the record, [Petitioner] sat quietly through the evidentiary phase of trial and his first outburst in court occurred after hearing the jury's unfavorable verdict.[9] [Petitioner] continued to occasionally voice his opinions, frustrations, and requests in court, but his outbursts do not appear to have been irrational or violent.

Based on the foregoing, [Petitioner] has failed to show the court abused its discretion. [Petitioner] has pointed to conflicts in the evidence that might reasonably have supported a finding that he was incompetent. However, as we read the evidentiary record, the evidence of his incompetence was not so overwhelming that it compelled a finding of incompetence.

What [Petitioner] wants us to do is conclude that the professional evidence of competence was professionally incompetent because Wilson had not seen Mathieson's report. However, Wilson was questioned at trial about the report, said he talked with Mathiesen about [Petitioner], and did read the report during trial, but Wilson never changed his opinion based upon the report. To reverse on this record, we would be required to make a professional psychological determination that Wilson's diagnosis was wrong. In other words, [Petitioner] wants this court to act as a posttrial psychological expert on his behalf. We are legally powerless and educationally unable to do so.

We stress that we do not have the same decisionmaking power as the trial court. "Our power to weigh the evidence is of course limited by due deference to the trier of fact, and we must therefore view the record in the light most favorable to the [finding]. [Citations.] ... [However, t]he [finding] must be supported by substantial evidence – that is, evidence 'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.]" (*People v. Samuel* (1981) 29 Cal.3d 489, 505.) "If the circumstances reasonably justify the trial court's finding[ ], reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact.... [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Here, in light of these standards and limitations, we must conclude there was substantial evidence to support the trial court's finding that [Petitioner] was competent throughout the trial proceedings, notwithstanding evidence to the contrary. The court did not abuse its discretion by denying the motion to reconsider and the motion for a new trial.

(LD 4 at 11-15.)

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a

defendant who is not competent to stand trial. *Medina v. California*, 505 U.S. 437, 439 (1992); *Drope*

---

[9]     [California Court of Appeal footnote 5:]  When the court excused the jurors after the verdict had been read, [Petitioner] said, "You're giving America a bad name. You know that. Justice a bad name. Scum." The bailiff told [Petitioner] to "Settle down." Later, before [Petitioner] was removed from the courtroom, he said, "Excuse me, Your Honor. Can I have a word? I never said a word throughout this thing."

*v. Missouri*, 420 U.S. 162, 171-73 (1975). The test for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001) ("[C]ompetence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense."); *cf. United States v. Hernandez*, 203 F.3d 614, 621 n.8 (9th Cir. 2000) ("The standard for competence to stand trial requires nothing more than that a defendant have some minimal understanding of the proceedings against him.").

"[A] State may presume that the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence." *Cooper v. Oklahoma*, 517 U.S. 348, 355 (1996) (*citing Medina*, 505 U.S. at 449). In California, a defendant is presumed competent unless the contrary is proven by a preponderance of the evidence. *See* Cal. Penal Code § 1369(f); *People v. Medina*, 51 Cal. 3d 870, 885 (1990).

In finding facts and determining credibility, a trial court is free to assign greater weight to the findings of government experts than to the opposing opinions of defense experts. *See United States v. Gastelum-Almeida*, 298 F.3d 1167, 1172 (9th Cir. 2002). A state court's determination of competency to stand trial is a question of fact and is entitled to a presumption of correctness in a federal habeas proceeding. *See Demosthenes v. Baal*, 495 U.S. 731, 735 (1990); *Torres v. Prunty*, 223 F.3d 1103, 1105 (9th Cir. 2000); *Brewer v. Lewis*, 989 F.2d 1021, 1027 (9th Cir. 1993); *see also* 28 U.S.C. § 2254(d)(2), (e)(1). Therefore, a federal court may overturn a state court competency finding only if rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Buckley v. Terhune*, 397 F.3d 1149, 1154-55 (9th Cir. 2005), *aff'd on reh'g en banc*, 411 F.3d 688 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 2094 (2007). In addition, a federal court can consider facts and evidence that were not available to the state trial court before and during trial. *Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2004). However, retrospective determinations of incompetence are disfavored, and considerable weight is given to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial. *Id.*

Here, the court of appeal explained that the trial court's competency determination was supported

by the evidence of Petitioner's ability to consult with his attorney with a reasonable degree of rational understanding, and the Court refers to the court of appeal's analysis of the facts. Petitioner argues that the evidence only shows a finding of incompetency during trial, and that there was no evidence or support that Petitioner was competent. (*See* SAP Mem. 5, 17; Traverse 12-13.) On the contrary, the court of appeal detailed the support for Petitioner's competency: Dr. Wilson's testimony, Dr. Lawhead's discharge diagnosis, the physicians and staff at ASH, and the trial court's own observations of Petitioner during trial. As the court of appeal stated, Petitioner desires a reviewing court to conduct its own weighing of the evidence in Petitioner's favor. This Court cannot do so, and must accord a presumption of correctness to the trial court's finding of Petitioner's competence, which can only be rebutted by clear and convincing evidence. *Demosthenes*, 495 U.S. at 735; *Buckley*, 397 F.3d at 1154-55; *Torres*, 223 F.3d at 1105; *see also* 28 U.S.C. § 2254(d)(2), (e)(1).

As stated by the court of appeal, at least some of the medical personnel who treated and observed Petitioner at ASH during his three-month stay, including Dr. Wilson and Dr. Lawhead, concluded that he was competent during trial and that his behavioral problems were due to a personality disorder and intentional misconduct, rather than a mental disorder. (*See, e.g.*, 3 RT 441-43, 457-58, 461, 475-77, 479, 484-85.) Dr. Wilson stated that the personality disorder he believed Petitioner suffered from would not disable a person from being competent to be tried, and that "[a]lthough antisocial personality disorder in a patient would not make them necessarily easier to deal with, . . . it would not be a mental disorder." (3 RT 461.) Dr. Wilson also stated that Petitioner's inability to cooperate with ASH personnel would not equate to incompetence for court proceedings—such as being "unable to understand either the process or assist counsel." (*Id.* 485; *see also* 1 CT 115 (certification of mental competency by Dr. Jeanne Garcia).) The fact that Dr. Schaeffer and arguably Dr. Mathiesen found to the contrary does not diminish the ASH personnel findings, especially in light of the constant interaction that Dr. Wilson and ASH personnel had with Petitioner during his three-month stay at ASH.

Furthermore, Dr. Schaeffer's conclusion that Petitioner was "incapable of assisting counsel for his defense" (1 CT 104) is contradicted by Dr. Wilson's testimony and Dr. Lawhead's discharge diagnosis, which Dr. Wilson corroborated. (3 RT 483-84.) Dr. Lawhead's discharge diagnosis stated "[Petitioner i]s likely to cause difficulties with his attorney or in court and/or malinger psychiatric

1   symptoms in an attempt to obtain more favorable court disposition if things do not appear to be going

2   his way in court." (*Id.* 484.)  The trial court could assign more weight to Dr. Wilson's testimony and

3   Dr. Lawhead's finding that Petitioner could manipulate his relationship with his attorney, and hold that

4   Petitioner was competent during trial.

5          In addition, the trial court could reasonably find defense counsel's belief in Petitioner's

6   incompetency to be a strategic post hoc rationalization of Petitioner's alleged "hardheadedness" during

7   trial (3 RT 508; *see* 1 CT 186-87), especially with Dr. Wilson's testimony of Petitioner's intentional

8   misconduct at ASH and Dr. Lawhead's diagnosis. (*See* 3 RT 508-10 ("[Prosecutor:] There was no point

9   in time during the course of the trial where [Petitioner's] actions gave rise to a situation where [defense

10  counsel], a very experienced trial attorney, felt or thought or believed that his client was incompetent

11  to further stand trial.  It's not until the sentencing phase, which is after the convictions, that this issue

12  of his competency comes.").)

13         Furthermore, the trial court could observe Petitioner's behavior and communicate with him

14  during the four-day trial.  *See Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir. 1995) (explaining that

15  although no particular facts signal incompetence, suggestive evidence includes a defendant's demeanor

16  before the trial court).  "In cases finding sufficient evidence of incompetency, the petitioners have been

17  able to show either extremely erratic and irrational behavior during the course of the trial, or lengthy

18  histories of acute psychosis and psychiatric treatment."  *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir.

19  1985).  This Court, after reviewing the trial record, concurs with the court of appeal's finding that

20  Petitioner remained quiet during the evidentiary phase of trial, and that his first outburst in court

21  occurred only after hearing the jury's unfavorable verdict.  (*See* 1 RT 282; *see also id.* 286 ("THE

22  DEFENDANT: Excuse me, Your Honor.  Can I have a word?  I never said a word throughout this

23  thing.").) Although remaining calm and composed during trial may not necessarily indicate competence,

24  *see Odle*, 238 F.3d at 1089 ("[A] judge may be lulled into believing that petitioner is competent by the

25  fact that he does not disrupt the proceedings, yet this passivity itself may mask an incompetence to

26  meaningfully participate in the process."), Dr. Schaeffer stated that Petitioner: (1) "understood the role

27  of his attorney in advocating for his best interests," (2) "understood the nature of a trial as an adversary

28  proceeding, with the purpose of establishing guilt or innocence," (3) "was able to reasonably describe

1   the respective roles of defense attorney, prosecuting attorney, judge, jury, defendant, and witnesses in

2   a trial proceeding," (4) "knew the nature of the offense of which he has reportedly been convicted and

3   for which he his facing sentencing," and (5) "appeared to appreciate the seriousness of his legal

4   situation."   (1 CT 103.)   Moreover, the Court notes that the trial court made its competency

5   determination primarily from evaluations and evidence made after the evidentiary phase of trial, and that

6   retrospective determinations of incompetence are disfavored, with considerable weight given to the lack

7   of contemporaneous evidence of Petitioner's incompetence to stand trial. *See Williams v. Woodford*,

8   384 F.3d at 608.

9        Based on the foregoing analysis, Petitioner has failed to present clear and convincing evidence

10  to rebut the presumption of correctness accorded to the trial court's finding of competency.

11  *Demosthenes*, 495 U.S. at 735; *Buckley*, 397 F.3d at 1154-55; *Torres*, 223 F.3d at 1105; *see also* 28

12  U.S.C. § 2254(d)(2), (e)(1).   Accordingly, the California courts' rejection of Petitioner's incompetency

13  claim was not based on an unreasonable determination of the facts in light of the evidence presented in

14  the state court proceeding.   Thus, habeas relief is not warranted on this claim.

15                                          **Claim Two**[10]

16        In his second claim, Petitioner asserts that he was denied the right to be present with counsel at

17  all stages of the proceedings against him.   (SAP 22-24; SAP Mem. 17-20.)   Specifically, Petitioner

18  claims that on January 9, 2004, the original date for sentencing, he and his counsel were not present at

19  a critical stage of the proceedings and that his conviction must thus be set aside.   (SAP Mem. 19-20.)

20        Petitioner raised this claim on August 28, 2006, in his fifth habeas petition before the California

21  Supreme Court.   (LD 21.)   On February 21, 2007, the California Supreme Court denied the petition

22  without comment but with citation to California cases indicating a procedural bar.   (*See* LD 22.)

23  Because the California Supreme Court did not reach the merits of this claim, the Court conducts a de

24  novo review of this claim.   *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) ("[W]e hold that

25  ───────────────

26        [10]      In Respondent's Answer, Respondent contends Claims Two through Seven of the SAP are procedurally
     defaulted.   (Answer 15-18.)   When the claims raised in a habeas petition are easier to resolve on the merits, the interests of
     judicial economy counsel against deciding the more complex or uncertain procedural default issues. *See Franklin v. Johnson*,
27   290 F.3d 1223, 1232 (9th Cir. 2002) (*citing Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)); *see also Batchelor v. Cupp*,
     693 F.2d 859, 864 (9th Cir. 1982).   Because such a situation exists here, the Court will address Petitioner's Claims Two
28   through Seven on the merits.

when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo."); *id.* at 1168 ("Nonetheless, under AEDPA, factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence.").

"The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (*citing Illinois v. Allen*, 397 U.S. 337 (1970)). However, the United States Supreme Court has recognized that this right is "protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *Id.* A due process right to be present at a proceeding is implicated "whenever his presence has a relation, reasonably substantial, to the fulness [sic] of his opportunity to defend against the charge." *Id.* (*quoting Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)); *see also Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). A defendant has a due process right to presence "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Gagnon*, 470 U.S. at 526 (*quoting Snyder*, 291 U.S. at 105-06). The "privilege of presence" is not implicated where the defendant's presence "would be useless, or the benefit but a shadow." *Stincer*, 482 U.S. at 745 (*quoting Snyder*, 291 U.S. at 106-07). Consequently, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Id.*; *see also Rushen v. Spain*, 464 U.S. 114, 117 (1983).

"By the [Supreme] Court's limitation of [the constitutional] right to 'critical stages of the trial,' clearly, a criminal defendant does not have a fundamental right to be present at *all* stages of the trial." *La Crosse v. Kernan*, 244 F.3d 702, 707-08 (9th Cir. 2001). Moreover, the right to be present is subject to harmless error analysis "unless the deprivation, by its very nature, cannot be harmless." *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc) (*citing Rushen*, 464 U.S. at 117 n.2). To obtain habeas relief, the trial error must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007).

To supply context to Petitioner's claim, a summary of the relevant facts will follow. The trial court was to sentence Petitioner on January 9, 2004; however, Petitioner's counsel underwent hand

1  surgery that day, preventing defense counsel from being present.  (Reporter's Supplemental Transcript

2  ("RST") 184-85.)  Although she did not state her appearance, Mary Ellen Hertle, an attorney, is listed

3  in the court's minute order (*see* 2 CT 387) and in the RST as appearing for and on behalf of Petitioner,

4  and indeed did speak on his behalf during the January 9, 2004, hearing.  (RST 184-86.)  During the

5  proceeding, after Hertle contacted Petitioner's counsel to ascertain a convenient sentencing date, the trial

6  court rescheduled the sentencing hearing to January 22, 2004.  (*Id.* 186.)  It is unclear from the RST if

7  Petitioner was present when the court announced January 22, 2004, as the new sentencing date (*see id.*),

8  but the court's minute order indicates that Petitioner was present at the January 9, 2004, proceeding.

9  (*See* 2 CT 387.)

10  On January 22, 2004, Petitioner and his counsel were present when the trial court sentenced

11  Petitioner.  (3 RT 520.)  At the beginning of the sentencing hearing on January 22, 2004, the court

12  discussed events leading to the hearing, and then stated: "The Court has also previously met together

13  with counsel.  Mr. McAllister [(Petitioner's counsel)] was not available on that day, due to an injury;

14  and the Court, though, took that time on that day to go over all the records in the file that pertain to this

15  case."  (*Id.* 521.)  The trial court then reiterated when the evidentiary phase of trial completed and when

16  the verdict was delivered, followed by further summary of the events after the verdict.  (*Id.* 521-22.)

17  Petitioner seizes on the aforementioned quoted language by the trial court to allege (1) that the

18  trial court held an "unreported meeting" on January 9, 2004, (2) that the court and the prosecution

19  reviewed the records pertaining to the case without Petitioner or his counsel present, and (3) that this

20  "unreported meeting" constituted a critical stage of the proceeding.  (SAP Mem. 18-20.)  Petitioner

21  provides no support for his claim that the prosecution was present without Hertle when the trial court

22  reviewed the case file, or that an unreported proceeding occurred during the trial court's going "over all

23  the records in the file that pertain to this case."  (3 RT 521.)  Instead, in the context of the trial court's

24  summary of the January 9, 2004, proceeding, it appears the trial court was merely stating that it

25  reinformed itself of the protracted criminal proceedings, especially in light of the length of time since

26  the August 15, 2002, verdict.  (*See id.*)

27  In addition, Petitioner provides no support that the January 9, 2004, hearing was "critical to [the

28  criminal proceeding's] outcome."  *Stincer*, 482 U.S. at 745.  Petitioner was not sentenced at the January

20

9, 2004, hearing, and the parties, including Hertle on behalf of Petitioner, only discussed the rescheduling of Petitioner's actual sentencing date. (RST 185-87.) Petitioner falls short of demonstrating his presence would have contributed to the fairness of the hearing, served any useful purpose, or had any effect whatsoever on the court's sentencing. *See Stincer*, 482 U.S. at 745. Furthermore, even assuming Petitioner's presence was required at the January 9, 2004, hearing, any error was harmless because only the rescheduling of dates was discussed, and Petitioner was present on his actual date of sentencing on January 22, 2004.

Accordingly, Petitioner was not denied his right to be present at a critical stage of his criminal proceeding, and habeas relief is unwarranted. *Stincer*, 482 U.S. at 745.

**Claim Three**

In his third claim, Petitioner contends that he was denied (1) his right to confront and cross-examine the witnesses against him, and (2) his due process and compulsory process rights to present a defense. (SAP Mem. 20-27.) Specifically, Petitioner claims that his confrontation rights were violated when the trial court refused to admit testimony of the shooting victim's involvement in another offense and testimony of two prior unrelated assaults against the shooting victim (*id.* 21-22, 25), and that Petitioner's due process and compulsory process rights to present a defense were violated when the trial court declined to admit evidence that the shooting victim suffered from two prior unrelated assaults (*id.* 25, 27).

Petitioner raised these claims in his fifth habeas petition before the California Supreme Court. (LD 21.) The California Supreme Court denied the petition without comment but with citation to California cases indicating a procedural bar. (*See* LD 22.) Because the California Supreme Court did not reach the merits of these claims, the Court conducts a de novo review of these claims. *See Pirtle*, 313 F.3d at 1167-68.

Right to Confront and Cross-Examine Witnesses

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has explained that the right of confrontation "means more than being allowed to confront the witness physically," but rather "[t]he main and essential purpose of confrontation is to secure for the opponent

the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (internal quotation marks and citation omitted); *Slovik v. Yates*, __ F.3d __, No. 06-55867, 2008 WL 4459083, at *3 (9th Cir. Oct. 6, 2008). The Confrontation Clause does not prevent a trial judge from imposing "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Slovik*, 2008 WL 4459083, at *3. Nevertheless, the Court has held that a defendant's Confrontation Clause rights have been violated when he is "prohibited from engaging in otherwise *appropriate* cross-examination . . . and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall*, 475 U.S. at 680 (*quoting Davis*, 415 U.S. at 318) (emphasis added). Accordingly, the defendant has met his burden when he has shown that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination." *Id.*

Confrontation Clause errors are subject to harmless-error analysis. *Slovik*, 2008 WL 4459083, at *6. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684; *Slovik*, 2008 WL 4459083, at *6. However, where, as here, the Court is conducting a review of Petitioner's claim on federal habeas corpus, the Court "reverts to the independent harmless error analysis that . . . would apply had there been no state court holding." *Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005). "Such independent harmless error analysis is described in *Brecht v. Abrahamson*, 507 U.S. 619[, 637] (1993): errors are harmless if they do not have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Inthavong*, 420 F.3d at 1059; *see Fry*, 127 S. Ct. at 2328. In any particular case the relevant factors in the harmless error analysis include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

Prior to the defense cross-examination of Jon Buehler, the detective that investigated Petitioner's

22

1 crime, the trial court held a hearing outside the presence of the jury on defense counsel's request to

2 question Buehler about the traffic stop of Peter Warda, the shooting victim.  (1 RT 107.)  Buehler

3 testified that, on August 3, 2002, just prior to Petitioner's trial, Warda was stopped for a vehicle code

4 violation.  (*Id.* 107-08.)  During the stop, a loaded handgun, which was later determined to have been

5 stolen during a residential burglary, was found in Warda's car.  (*Id.* 108, 111.)  Although not the officer

6 that cited Warda, Buehler learned of the incident and volunteered to contact Warda to attempt to obtain

7 a statement from Warda about the gun.  (*Id.* 109.)  Warda admitted to Buehler that the gun was his and

8 that he kept it for protection.  (*Id.*)  Buehler later learned that Warda "had not followed legal channels"

9 in purchasing the gun.  (*Id.*)  Warda told Buehler that he purchased the gun at a flea market and that he

10 did not know that it had been stolen.  (*Id.* 110.)  The detective handling Warda's traffic stop, Craig

11 Grogan, cited Warda for a misdemeanor[11] and did not arrest Warda because he did not have any felony

12 convictions.  (*Id.*)

13   Buehler testified that it was solely Grogan's decision whether to cite or arrest Warda.  (*Id.* 110,

14 115-16.)  Buehler stated that when Warda was stopped, the gun was in Warda's vehicle but not on his

15 person, and that there was another man in the vehicle.  (*Id.* 112.)  Buehler stated that it "would have been

16 a stretch" to prove that Warda knew the gun was stolen or that he was concealing the weapon.  (*Id.*)

17 Buehler testified that he merely offered to become involved in Warda's traffic stop case because he

18 believed that, due to his prior association with Warda in investigating Petitioner's case, he could get

19 Warda to admit ownership of the gun and enable the police to charge Warda with some offense.  (*Id.*

20 115-116.)  Buehler further testified that he was unaware of the current status of Warda's traffic stop case.

21 (*Id.* 117.)

22   Following Buehler's testimony, the trial court ruled that there was no evidence of Buehler's

23 motivation to give Warda preferential treatment with regard to the traffic stop, and that there was no

24 evidence that Warda was aware of any preferential treatment.  (*Id.* 120.)  The court, in a later hearing

25 held outside the jury denying defense counsel's request to present Warda's possession of a stolen gun

26 as an act of moral turpitude, elaborated on its decision not to allow testimony of Warda's traffic stop.

27

28    [11] Buehler speculated that the misdemeanor charge was "possession of a firearm in public loaded."  (1 RT 110.)

(*Id.* 183.)  The court considered how any testimony regarding Warda and the stolen gun would be dealt with by the jury, and found that it would be more prejudicial than probative.  (*Id.* 188.)  The trial court reached this conclusion by stating: (1) the jury could not apply the rules with regard to moral turpitude until they decided whether Warda was guilty of receiving stolen property; (2) the quantum of evidence was not enough such that the jury could determine whether Warda in fact either stole the weapon himself or had possession of it under circumstances where he knew it was stolen; (3) that the evidence only showed that Warda admitted possession of the gun; (4) that there were no eyewitnesses to the specific intent requirement of the charge of receiving stolen property; (5) that there was insufficient evidence, based on Buehler's testimony, to show any connection between Warda's traffic stop case or Petitioner's case and any favoritism on Buehler's part; (6) that there was insufficient evidence and that it would be too difficult for the jury to infer that Warda was told anything that would be done in his favor; and (7) ultimately, the evidence was insufficient for the inference of moral turpitude, and that based on California Evidence Code section 352 and *People v. Wheeler*, 4 Cal. 4th 284 (1992), any testimony would be more prejudicial than probative.  (1 RT 183-88.)  In a separate unrecorded hearing, the trial court also excluded evidence of two prior assaults, a 2000 stabbing and a January 24, 2002, shooting, inflicted upon Warda by persons other than Petitioner.  (*Id.* 189.)

Petitioner contends that the trial court erred in excluding testimony regarding Warda's possession of the stolen gun because the incident revealed that there was a close relationship between Warda and Buehler and that Warda received a "large favor" from Buehler.  (SAP Mem. 21-22, 25.)  Petitioner argues that Warda received a citation instead of being arrested so that Warda would testify and "look better on the stand" as the prosecution's main witness implicating Petitioner.  (*Id.* 21-22.)  In addition, Petitioner alleges that testimony of potential third-party culpability with regard to the prior assaults is highly probative of someone other than Petitioner shooting Warda in 1999.  (*Id.* 20-21.)

Preliminarily, the Court notes Petitioner does not clearly state which witness(es) he asserts his Confrontation Clause claims against, and the Court assumes that Petitioner raises his claims against Buehler and Warda.  *See United States v. Larson*, 495 F.3d 1094, 1103 (9th Cir. 2007) (stating that review of the limitation on cross-examination is conducted on each witness separately) (*citing Van Arsdall*, 475 U.S. at 680).

24

1      As to Buehler, the Court finds that the trial court imposed "reasonable limits" on his cross-
2 examination due to the prejudice that would result from asking about Warda's traffic stop.  Buehler
3 testified that Detective Grogan solely made the determination about which charges would be filed
4 against Warda, and Grogan's decision to file a misdemeanor charge was reasonable in light of the
5 available evidence, including the presence of another person in Warda's car and the difficulty of proving
6 Warda stole the gun or knew that it was stolen.  Buehler's assistance, which helped to establish Warda
7 and not his companion in the car as the possessor of the gun, allowed the police to charge Warda with
8 a misdemeanor.  In addition, Buehler testified that Grogan cited Warda and did not arrest him because
9 he did not have any felony convictions.  Based on these facts, it was reasonable for the trial court to
10 conclude that the inference of favoritism on Buehler's part and any knowledge by Warda thereof would
11 be more prejudicial than probative due to insufficient evidence to establish the inference.

12      Assuming without finding that the trial court committed constitutional error by limiting Buehler's
13 cross-examination, that error must have had a "substantial and injurious effect or influence in
14 determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Fry*, 127 S. Ct. at 2328.  Warda identified
15 Petitioner as the shooter before the traffic stop incident to other witnesses, and these witnesses
16 corroborated Warda's identification of Petitioner to them.  After the shooting in September 1999, while
17 Warda was in the hospital, he identified Petitioner as the shooter to Officer Larry Meyer (1 RT 50-51,
18 65-68), and Meyer corroborated this identification (*id.* 141-42, 145-46).  Buehler testified that Warda
19 made contact with Officer Dave Ramirez on September 15, 1999, and identified Petitioner as the
20 shooter, and that Ramirez made a report that included the identification and sent it to Buehler.  (1 RT
21 103-04.)  In addition, Julio Rodriguez, present at the scene of the shooting, testified that Warda said "All
22 right, Robert" toward the shooter more than once just before Warda was shot by Petitioner.  (*Id.* 154-55.)
23 Furthermore, Warda testified that he was shown a photo lineup in July 2000, more than two years before
24 the traffic stop, by Detective Carter and that he identified Petitioner as the shooter.  (*Id.* 87-89.)
25 Accordingly, if the jury heard Buehler's testimony of the incident involving the gun found in Warda's
26 car and Grogan's decision to pursue misdemeanor charges, that testimony would not have had a
27 "substantial and injurious effect or influence in determining the jury's verdict" in light of the numerous
28 occurrences of Petitioner's identification before Warda's traffic stop.

As for Warda, the Court also finds that the trial court imposed "reasonable limits" on his cross-examination. The aforementioned analysis of Buehler's testimony equally applies to Warda's testimony, in particular the insufficient amount of evidence to show Warda stole the gun or knew that it was stolen. Based on these facts, it was reasonable for the trial court to conclude that there was insufficient evidence for the inference of Warda's moral turpitude and that any testimony related to the traffic stop would be more prejudicial than probative.

With regard to testimony of the prior assaults, Petitioner fails to explain, beyond the mere possibility that the assailants in the 2000 and 2002 assaults could have shot Warda in 1999, how they are relevant. The probative value of these prior assaults is extremely low, especially taking into account defense counsel's trial strategy to cast doubt on Warda's identification of Petitioner as the shooter in 1999. The Supreme Court has recognized a trial court's discretion to exclude evidence of third-party culpability when the evidence is speculative, remote, or does not lead to prove or disprove a material fact at issue in trial. *See Holmes v. South Carolina*, 547 U.S. 319, 327 (2006). Here, the trial judge could reasonably determine that evidence of these two prior assaults would unfairly prejudice and/or confuse the jury without any showing that these assaults or their assailants were related to Petitioner's shooting in 1999.

The harmless error analysis as to Buehler likewise applies to Warda. If the jury was allowed to hear Warda testify as to the traffic stop or to the prior assaults, that testimony would not have a "substantial and injurious effect or influence in determining the jury's verdict" due to the numerous witnesses that were told Petitioner was the shooter, all before the gun was found in Warda's vehicle.

Accordingly, and for the foregoing reasons, Petitioner was not denied his right to confront and cross-examine witnesses against him, and habeas relief is unwarranted for this claim. *Van Arsdall*, 475 U.S. at 679; *Davis*, 415 U.S. at 315-16.

<u>Due Process and Compulsory Rights to Present a Defense</u>

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "The Supreme Court has indicated that a defendant's right to present a defense stems both from the right to due process provided by the Fourteenth Amendment . . . and from the right 'to have compulsory process for obtaining witnesses in

1   his favor' provided by the Sixth Amendment." *Moses v. Payne*, 543 F.3d 1090, 1101 (9th Cir. 2008)

2   (*citing Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) and *Washington v. Texas*, 388 U.S. 14, 23

3   (1967)).

4   However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject

5   to reasonable restrictions," such as evidentiary and procedural rules. *United States v. Scheffer*, 523 U.S.

6   303, 308 (1998). In fact, "state and federal rulemakers have broad latitude under the Constitution to

7   establish rules excluding evidence from criminal trials," *id.*, and the Supreme Court has indicated its

8   approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its

9   probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues,

10   or potential to mislead the jury," *Holmes*, 547 U.S. at 326. Evidentiary rules do not violate a defendant's

11   constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or

12   disproportionate to the purposes they are designed to serve." *Id.* at 324 (internal quotation marks

13   omitted); *see also Scheffer*, 523 U.S. at 315 (explaining that the exclusion of evidence pursuant to a state

14   evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the

15   accused's defense"). In general, it has taken "unusually compelling circumstances . . . to outweigh the

16   strong state interest in administration of its trials." *Perry v. Rushen*, 713 F.2d 1447, 1452 (9th Cir.

17   1983); *see also Moses*, 543 F.3d at 1101-02.

18   When deciding whether the exclusion of evidence violates the due process and compulsory rights

19   to present a defense, the Ninth Circuit has applied the following balancing test: (1) the probative value

20   of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation

21   by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether

22   it constitutes a major part of the attempted defense. *Moses*, 543 F.3d at 1103-04 (*quoting Miller v.

23   Stagner*, 757 F.2d 988, 994 (9th Cir.), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985)). The

24   court must also give due weight to the substantial state interests underlying the state evidentiary rules

25   on which the exclusion was based. *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004). Harmless error

26   analysis under *Brecht* applies to a trial court's exclusion of evidence. *See Moses*, 543 F.3d at 1105.

27   As discussed in the confrontation and cross-examination analysis, *supra*, in an unrecorded

28   hearing, the trial court excluded evidence of two prior assaults inflicted upon Warda by persons other

27

than Petitioner. (1 RT 189.) Petitioner alleges that this evidence of potential third-party culpability is highly probative of someone other than Petitioner shooting Warda in 1999. (SAP Mem. 27.) Petitioner contends the refusal to allow this evidence rendered his trial unfair in violation of his right to present a defense. (*Id.*)

For the same reasons that the Court denied this claim on confrontation and cross-examination grounds, including the Court's harmless error analysis, *see supra*, the Court denies Petitioner's third-party culpability exclusion claim on due process and compulsory rights grounds. Accordingly, Petitioner was not denied his due process and compulsory rights to present a defense, and habeas relief is unwarranted for this claim. *Crane*, 476 U.S. at 690.

**Claim Four**

In his fourth claim, Petitioner contends that (1) the prosecution's failure to turn over the true details of Warda's plea agreement in another case violated *Brady v. Maryland*, 373 U.S. 83 (1963), and (2) a prosecutor assigned to another case that explained the details of the plea agreement improperly vouched for Warda's credibility in violation of Petitioner's due process right to a fair trial. (SAP Mem. 28-37.)

Petitioner raised these claims in his fifth habeas petition before the California Supreme Court. (LD 21.) The California Supreme Court denied the petition without comment but with citation to California cases indicating a procedural bar. (*See* LD 22.) Because the California Supreme Court did not reach the merits of these claims, the Court conducts a de novo review of these claims. *See Pirtle*, 313 F.3d at 1167-68.

*Brady* Error

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three essential components to a *Brady* claim: (1) "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) the "evidence must have been suppressed by the State," and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[T]he terms 'suppression,' 'withholding,' and 'failure to disclose' have the same

1   meaning for *Brady* purposes." *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002).

2          To determine whether prejudice exists, a court must look to the materiality of the suppressed

3   evidence. *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006); *see Jackson v. Brown*, 513 F.3d 1057,

4   1070-71 (9th Cir. 2008). Evidence is material "if there is a reasonable probability that, had the evidence

5   been disclosed to the defense, the result of the proceeding would have been different." *United States*

6   *v. Bagley*, 473 U.S. 667, 682 (1985). "Reasonable probability" may be found even where the remaining

7   evidence would have been sufficient to convict the defendant. *Strickler*, 527 U.S. at 290. Moreover,

8   "reasonable probability" can be found without finding that the outcome would more likely than not have

9   been different. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Instead, "[a] 'reasonable probability' of a

10  different result [exists] when the government's evidentiary suppression 'undermines confidence in the

11  outcome of the trial.'" *Id.* (*quoting Bagley*, 473 U.S. at 678). Courts must examine the withheld

12  evidence individually and cumulatively. *See id.* at 436-37 & n.10.

13         During Warda's cross-examination, defense counsel asked Warda about his November 29, 2001,

14  guilty plea to second degree burglary. (1 RT 77.) When queried by defense counsel about a deal relating

15  to the plea bargain, Warda denied that he entered into an agreement with respect to his testimony in

16  Petitioner's case. (*Id.* 78-80.) Warda testified that he had not yet been sentenced on the burglary charge,

17  but that the sentence was not contingent on his testimony in Petitioner's case. (*Id.* 79-81.) Warda

18  admitted that he spoke with the prosecutor in Petitioner's case about how his testimony would affect his

19  sentence in the burglary case (*id.* 83), but then stated that a different prosecutor than the one involved

20  in Petitioner's case handled the plea bargain in the burglary case, and that he received the same plea

21  bargain as his co-defendant in that case (*id.* 84). Warda testified that he expected to be sentenced for

22  sixty days for the burglary and that he believed he would be permitted to serve the sentence in house

23  arrest or in an alternative work program. (*Id.* 84.)

24         During the defense case, the prosecutor in Warda's burglary case, deputy district attorney Tom

25  Brennan, testified that on November 29, 2001, he was assigned to Warda's burglary case. (1 RT 168-

26  69.) Brennan was aware that Warda was the victim in Petitioner's case at the time Brennan entered into

27  plea negotiations with Warda in the burglary case. (*Id.* 169.) Brennan testified that he "had an interest

28  in [Warda] testifying truthfully in [Petitioner's] case." (*Id.*) Brennan told Warda that, if he agreed to

plead guilty to felony burglary and to testify truthfully in Petitioner's trial, Warda would receive sixty days in local county jail; if Warda did not testify truthfully or at all, he would receive no more than 365 days in jail. (*Id.* 170-71.) Brennan guaranteed that Warda would not go to state prison in either case. (*Id.* 170.) Brennan stated if Warda received the lower amount of sixty days in jail, Warda had the ability to apply for home monitoring or an alternative work program. (*Id.* 173.) Brennan testified that Warda would have to apply through the sheriff for home monitoring or an alternative work program, and that those alternatives would be "available" with a sixty-day sentence. (*Id.*)

Following the jury verdict, defense counsel filed a motion for new trial based in part on a *Brady* violation during trial. (3 RT 496-97.) Defense counsel argued that the terms of Warda's plea agreement included an *assurance* that he would receive the alternative work program, a fact defense counsel argued was not disclosed to the jury when Brennan testified at trial. (*Id.* 497.) Defense counsel stated that this alleged assurance of an alternative work program should have been brought forward so that Warda could be cross-examined about it and the "consistency this brought out," including impeachment of Warda and later, Brennan. (*Id.* 498, 501.) Defense counsel stated that he had not learned of the alleged assurance until approximately three or four months following Petitioner's trial. (*Id.* 498.) Following the hearing, the trial court denied the motion for new trial. (2 CT 386.)

Petitioner seizes on this record to argue that defense counsel was not informed from either the prosecution or Brennan of the true nature of Warda's plea agreement: that Warda was allegedly given the *assurance* and not just the *possibility* of an alternative work program if he testified for the prosecution in Petitioner's case. (SAP Mem. 29; Traverse 19.) Petitioner argues that this information, if given to defense counsel prior to the cross-examination of Warda, would have strengthened Petitioner's case by allowing defense counsel to impeach Warda's denial of a plea agreement in exchange for testifying in Petitioner's case. (SAP Mem. 29; Traverse 19.)

Petitioner's argument is without merit. Turning to the application of the *Brady* factors, although evidence of an assurance that Warda would receive an alternative work program for his testimony in Petitioner's case would be favorable to Petitioner, specifically in allowing defense counsel to impeach Warda, *see Strickler*, 527 U.S. at 281-82, Petitioner has not established that Warda's plea agreement did in fact have this assurance. The prosecutor at the motion for new trial hearing stated that "the custom

1  and practice of [Stanislaus] county [is] that the assurances as far as work program[s] lie with the sheriff.

2  This isn't [something] a prosecutor can assure and wouldn't assure." (3 RT 499.)  In addition, the trial

3  court at the motion hearing stated that "if a person is sentenced to 60 days . . . they have an *opportunity*

4  to apply to the sheriff for the alternative work program, and *if they're accepted* by the sheriff, they're

5  in the program.  If they're not accepted by the sheriff, they're not in the program, and . . . the Court has

6  no role in that procedure . . . ." (*Id.* 500 (emphasis added).)  The record of Warda's November 22, 2002,

7  sentencing on the burglary conviction supports the lack of an assurance because the prosecutor at the

8  sentencing stated that there "was a 60-day agreed-upon disposition,"[12] but the prosecutor did not say that

9  Warda was *assured* the alternative work program.  (*See* 2 CT 366.)[13]  The Warda sentencing court stated

10  that it would "grant [Warda] time to *get into* alternative work," and subsequently granted him probation

11  and ordered Warda to serve sixty days in the county jail.  (*Id.* 367, 369 (emphasis added).)  This record

12  supports the interpretation that Warda was not guaranteed the alternative work program.

13       Petitioner has also not established that the prosecution suppressed, withheld, or failed to disclose

14  any alleged assurance.  *See Benn*, 283 F.3d at 1053; *see also Strickler*, 527 U.S. at 282.  Defense counsel

15  had the information of Warda's plea agreement including the possibility of a sixty-day sentence, home

16  monitoring, or an alternative work program, as evidenced by defense counsel's questions in cross-

17  examining Warda.  (*See* 1 RT 78-84.)  As explained above, Petitioner has not shown that Brennan

18  assured Warda an alternative work program in lieu of jail.  Brennan, in his testimony, provided the

19  details of Warda's plea agreement, which corroborated the questions that defense counsel asked Warda

20  during cross-examination.

21       Finally, Petitioner has not shown that, assuming the prosecution suppressed any assurance made

22

23       [12]     It appears Brennan was not present at Warda's sentencing because he had been involved in an accident.
24  (*See* 2 CT 366.)

25       [13]     Warda's defense counsel at Warda's sentencing stated that Brennan had "some knowledge about [Warda's]
   case in regards to assuring the fact that Mr. Warda gets AWP because of his involvement in another case." (*See* 2 CT 366.)
26  However, this statement by Warda's defense counsel, if construed to state that Brennan *could* assure an alternative work
   program, in unsupported in light of the prosecutor and judge's statements at Petitioner's motion for new trial hearing that the
27  determination of an alternative work program is made by the sheriff, not the prosecutor. (*See* 3 RT 499-500.)  In addition,
   if this statement by Warda's defense counsel is construed to state that Brennan *made* an assurance for an alternative work
28  program, that is unsupported by the prosecutor's statement at Petitioner's motion for new trial hearing that prosecutors
   "wouldn't assure" alternative work programs.  (*See id.* 499.)

by Brennan, the assurance of an alternative work program for Warda testimony is material. *Jackson*, 513 F.3d at 1070-71.   The jury heard that Warda was offered a lesser sentence in exchange for his truthful testimony: Brennan told Warda that, if he agreed to plead guilty to felony burglary and to testify truthfully in Petitioner's trial, Warda would receive sixty days in local county jail; if Warda did not testify truthfully or at all, he would receive no more than 365 days in jail.  (1 RT 170-71.)   During closing arguments, the prosecutor accurately explained Warda's plea agreement and reiterated Warda would still be a felon:

> The deal is he's got to do sixty days in jail if he testifies truthfully.  Still got to do sixty days.  Whether he does it in the work program, he's still got a felony on his record and got to do the time one way or the other.  It's not a freebie. . . . He's got a felony on his conviction.  He's got to do some type of incarceration or work time. . . . He's still a felon after that.

(*Id.* 234-35.)  Defense counsel in closing arguments highlighted Warda's credibility as a convicted felon (1 RT 245, 249), and that Warda made a deal in his burglary case and then lied about it during cross-examination (*id.* 246).  Defense counsel also told the jury that because of Warda's agreed-upon sixty-day sentence, he may not have to serve any time in jail.  (*Id.* at 246-47.)  Defense counsel also stated that although charges were pending against Warda, he was not incarcerated and appeared in court as the "victim" to bolster the prosecution's case rather than wearing an "orange jumpsuit." (*Id.* 247.)  Thus, there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Bagley*, 473 U.S. at 682, and there is no undermining of the "confidence in the outcome of the trial" *Kyles*, 514 U.S. at 434.

Accordingly, and for the foregoing reasons, the prosecution did not commit *Brady* error. *Brady*, 373 U.S. at 87.[14]

---

[14]   To the extent that Petitioner claims the prosecution's alleged failure to correct Warda's testimony is in itself sufficient error outside the *Brady* context (*see* SAP Mem. 29-30), that claim is without merit.

The State may not use false evidence to obtain a criminal conviction, and "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  The State violates a criminal defendant's right to due process of law when, although not soliciting false evidence, the State allows false evidence to go uncorrected when it appears. *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (*citing Alcorta v. Texas*, 355 U.S. 28 (1957) and *Pyle v. Kansas*, 317 U.S. 213 (1942)).

However, any false testimony must be material. *Id.* at 984.  "In assessing materiality under *Napue*, we determine whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury'; if so, then 'the conviction must be set aside.'" *Id.* (citation and internal quotation marks omitted); *see United States v. Agurs*, 427 U.S. 97, 103 (1976).  This materiality standard is the same materiality standard utilized in the *Brady* context, *see supra*: whether

Improper Vouching

"As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (citation and internal quotation marks omitted). "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *Id.* The Supreme Court has stated:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18-19 (1985). To warrant habeas relief, prosecutorial vouching must "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (*citing Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also Darden*, 477 U.S. at 193 (stating prosecutorial misconduct violates due process when it renders a trial "fundamentally unfair").

Petitioner contends Brennan's testimony of Warda's plea agreement constituted vouching of Warda's prior testimony because Brennan stated that he had an interest in Warda testifying truthfully in Petitioner's case and that the plea agreement was contingent on Warda's truthful testimony. (*See* SAP Mem. 36-37; 1 RT 170-71.) However, Brennan's testimony was simply a summary of the plea agreement and his reason for entering into an agreement with Warda. Thus, the prosecutor in Petitioner's case never vouched for Warda's testimony by allowing Brennan to be called by defense counsel. In addition, Brennan did not vouch for Warda by summarizing the plea agreement but rather laid the foundation for defense counsel's argument that Warda lied about the terms of the plea agreement

---

presence of the false evidence "undermines confidence in the outcome of the trial." *Hayes*, 399 F.3d at 984; *see Kyles*, 514 U.S. at 434. In light of Brennan's testimony detailing Warda's plea agreement and the Court's finding that any alleged assurance made by Brennan would not undermine "confidence in the outcome of the trial," the Court finds the prosecution's alleged failure to correct Warda's testimony did not raise "any reasonable likelihood that . . . could have affected the judgment of the jury," and there is no undermining of the "confidence in the outcome of the trial."

1   during his cross-examination.

2       As to the condition that Warda testify "truthfully," the following inquiry occurred at trial:

3           [Defense counsel:] Well, the decider of whether it was truthful, that would be the
        [district attorney]?
4           [Brennan:] I would say not necessarily. I'd have to observe all the testimony in
        this case, which I haven't done. I'd have to confer with the judge, [the prosecutor in
5       Petitioner's case] and Mr. Warda's defense attorney who went into plea negotiations with
        me on the prior burglary so we'd have to have some kind of meeting of the minds. I
6       can't just arbitrarily say Peter Warda lied.

7   (1 RT 171-72.) Petitioner argues that Brennan's aforementioned testimony falsely bolstered Warda's

8   testimony by emphasizing the truthfulness requirement as well as a false "representation that there will

9   be an investigation of Warda's testimony and an independent examination of its truthfulness." (SAP

10  Mem. 36.) However, in describing the requirement that Warda testify truthfully, Brennan did not imply

11  that there was information known by the government or by the trial court that would bolster Warda's

12  credibility, or that a determination had been made that Warda's testimony was truthful.

13      Petitioner also claims that the prosecutor's statement "I submit to you in this case Peter Warda

14  told you the truth" made during closing argument constituted improper vouching. (*See* SAP Mem. 36-

15  37; 1 RT 229; *see also id.* 237 ("[Prosecutor:] . . . [Warda] told you the truth.").) The prosecutor was

16  merely prefacing his argument of the reasons for believing Warda identified Petitioner as the shooter,

17  not that Warda was truthful in his cross-examination. The prosecutor's comments throughout the

18  closing arguments indicate that he was urging the jury to find the witnesses credible, not that the

19  prosecutor knew them to be so. (*See* 1 RT 229.) Arguing that the record supports the witness'

20  credibility is not vouching or misconduct. *See Necoechea*, 986 F.2d at 1279 (finding prosecutor

21  permitted to say "I submit to you that [the witness] is telling the truth" because the statement did not

22  imply that the government was assuring the witness' veracity and did not reflect the prosecutor's

23  personal beliefs).

24      Accordingly, and for the foregoing reasons, the prosecutor and Brennan's remarks were not

25  improper, let alone so egregious as to render Petitioner's trial fundamentally unfair. *Darden*, 477 U.S.

26  at 181, 193; *Davis v. Woodford*, 384 F.3d at 644. Thus, habeas relief is unwarranted.

27                          **Claim Five**

28      In his fifth claim, Petitioner contends that he was denied his right to testify on his own behalf.

                                  34

1    (SAP Mem. 37-45.)

2         Petitioner raised this claim in his fifth habeas petition before the California Supreme Court. (LD

3    21.) The California Supreme Court denied the petition without comment but with citation to California

4    cases indicating a procedural bar. (*See* LD 22.) Because the California Supreme Court did not reach

5    the merits of this claim, the Court conducts a de novo review of this claim. *See Pirtle*, 313 F.3d at 1167-

6    68.

7         A defendant has a right to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 51-53

8    (1987). "The right is personal, and 'may only be relinquished by the defendant, and the defendant's

9    relinquishment of the right must be knowing and intentional.'" *United States v. Pino-Noriega*, 189 F.3d

10   1089, 1094 (9th Cir. 1999) (*quoting United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)).

11        However, while waiver of the right to testify must be knowing and voluntary, it need not be

12   explicit. *Id.* "A defendant is 'presumed to assent to his attorney's tactical decision not to have him

13   testify.'" *Id.* (*quoting Joelson*, 7 F.3d at 177). "A court has no duty to affirmatively inform defendants

14   of their right to testify, or to inquire whether they wish to exercise that right." *Id.* at 1094-95 (*citing*

15   *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990)). "[W]aiver of the right to testify may be

16   inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify

17   the court of his desire to do so." *Id.* at 1095 (citation omitted). A defendant who wants to reject his

18   attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or

19   discharging his lawyer." *Id.* When a defendant remains "silent in the face of his attorney's decision not

20   to call him as a witness," he waives the right to testify. *Id.* (*quoting United States v. Nohara*, 3 F.3d

21   1239, 1244 (9th Cir. 1993)). If the defendant says nothing until after the verdict has been read, the right

22   has been waived. *Id.* (*citing Edwards*, 897 F.2d at 446).

23        Here, the record does not show Petitioner made any attempt to notify the trial court or his counsel

24   of his desire to testify at trial. Petitioner's argument that his incompetence during trial precluded a

25   knowing and voluntary waiver of his right to testify is without merit because, as discussed *supra*, the

26   Court has found the California courts' finding of Petitioner's competency during trial was not an

27   unreasonable determination of the facts. Accordingly, Petitioner waived his right to testify at trial, and

28   habeas relief is unwarranted on this claim. *Rock*, 483 U.S. at 51-53; *Pino-Noriega*, 189 F.3d at 1094-95.

**Claim Six**

In his sixth claim, Petitioner contends that trial and appellate counsel rendered ineffective assistance.  (SAP Mem. 45-46.)

Petitioner raised this claim in his fifth habeas petition before the California Supreme Court.  (LD 21.)  The California Supreme Court denied the petition without comment but with citation to California cases indicating a procedural bar.  (*See* LD 22.)  Because the California Supreme Court did not reach the merits of this claim, the Court conducts a de novo review of this claim.  *See Pirtle*, 313 F.3d at 1167-68.

For a petitioner to prevail on an ineffective assistance of counsel claim, he must show: (1) that counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A court evaluating an ineffective assistance of counsel claim does not need to address both components of the test if the petitioner cannot sufficiently prove one of them.  *Id.* at 697; *Thomas v. Borg*, 159 F.3d 1147, 1151-52 (9th Cir. 1998).

To prove deficient performance, a petitioner must show that counsel's representation fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88.  Because of the difficulty in evaluating counsel's performance, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Only if counsel's acts or omissions, examined in light of all the surrounding circumstances, fell outside this "wide range" of professionally competent assistance will the petitioner prove deficient performance.  *Id.* at 690; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  The petitioner must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689.

Establishing counsel's deficient performance does not warrant setting aside the judgment if the error had no effect on the judgment.  *Id.* at 691; *Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998).  A petitioner must show prejudice such that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.  *Strickland*, 466 U.S. at 694.  Thus, the petitioner will only prevail if he can prove that counsel's errors resulted in a "proceeding [that] was fundamentally unfair or unreliable."  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

1    The Strickland standard also applies to claims of ineffective assistance of appellate counsel.

2  *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).  Appellate counsel does not have a constitutional duty

3  to raise every non-frivolous issue requested by a defendant.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

4  Counsel "must be allowed to decide what issues are to be pressed"; otherwise, the ability of counsel to

5  present the client's case in accord with counsel's professional evaluation would be "seriously

6  undermined."  *Id.*  There is, of course, no obligation to raise meritless arguments on a client's behalf.

7  *See Strickland*, 466 U.S. at 687-88.

8    Petitioner claims that appellate counsel's failure to raise the "confrontation and cross

9  examination claim, the compulsory process claim, the *Brady* claims, . . . the Sixth Amendment and Due

10  Process claims," the vouching claim, and the right to testify claim on direct appeal constituted ineffective

11  assistance.  (SAP Mem. 45-46.)  As discussed *supra*, all these claims raised in the SAP are without

12  merit.  As a result, Petitioner identifies no grounds establishing ineffective assistance of appellate

13  counsel based on failure to assert these claims on direct appeal, as an attorney does not provide

14  ineffective assistance for failing to raise meritless claims on appeal.  *See Wildman v. Johnson*, 261 F.3d

15  832, 840-42 (9th Cir. 2001) (finding appellate counsel's failure to raise issues on direct appeal does not

16  constitute ineffective assistance when appeal would not have provided grounds for reversal).

17    In addition, Petitioner argues that trial counsel's failure to (1) inform Petitioner of his right to

18  testify on his own behalf, (2) put Petitioner on the stand when he indicated his desire to testify, and (3)

19  object to vouching testimony and argument by the prosecution, constituted ineffective assistance.  (SAP

20  Mem. 46.)  Petitioner has not provided any evidence of trial counsel's failure to inform Petitioner of his

21  right to testify or to allow Petitioner to take the stand.  *See Jackson v. Calderon*, 211 F.3d 1148, 1155

22  (9th Cir. 2000) (finding unsupported speculation and conclusory allegations regarding an attorney's

23  substandard performance are not sufficient to show either deficient performance or prejudice).

24  Furthermore, trial counsel's failure to object to alleged vouching testimony and argument by the

25  prosecution does not constitute ineffective assistance because, as stated *supra*, the Court finds that

26  Brennan's testimony and the prosecution's closing argument did not constitute improper vouching.

27    Based on the foregoing, Petitioner has failed to show trial or appellate counsel's performance

28  was deficient.  *Strickland*, 466 U.S. at 687-88.  Moreover, even if trial or appellate counsel's

performance was deficient, Petitioner has failed to show the result of the trial or appeal would have been any different.  *Id.*  Thus, habeas relief is not warranted on this claim.

### Claim Seven

In his seventh claim, Petitioner contends that the cumulative effect of errors deprived him of due process and a fair trial.  (SAP Mem. 46-48.)

Petitioner raised this claim in his fifth habeas petition before the California Supreme Court.  (LD 21.)  The California Supreme Court denied the petition without comment but with citation to California cases indicating a procedural bar.  (*See* LD 22.)  Because the California Supreme Court did not reach the merits of this claim, the Court conducts a de novo review of this claim.  *See Pirtle*, 313 F.3d at 1167-68.

"Cumulative error occurs when although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant."  *Wooten v. Kirkland*, 540 F.3d 1019, 1022 n.1 (9th. Cir. 2008) (*quoting Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)) (internal quotation marks omitted).  A court "must ask whether the aggregated errors so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (*quoting Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004)) (internal quotation marks omitted).  "[W]here there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation."  *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

Because the Court finds, as discussed *supra*, no error committed by the trial court, there is no cumulative error.  *Fuller*, 182 F.3d at 704.  Accordingly, habeas relief is not warranted on this claim.

### Certificate of Appealability

Under the AEDPA, an applicant seeking to appeal a district court's dismissal of a habeas petition under 28 U.S.C. § 2254 must first obtain a certificate of appealability ("COA") from a district judge or circuit judge.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A judge should either grant the COA or state reasons why it should not issue.  Fed. R. App. P. 22(b)(1).  A COA request should be decided by a district court in the first instance.  *Id.*; *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

1   The applicant for a COA must make a "substantial showing of the denial of a constitutional

2   right."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *United States v.*

3   *Christakis*, 238 F.3d 1164, 1168 n.4 (9th Cir. 2001).  A "substantial showing" is defined as a

4   demonstration (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the

5   issues differently; or (3) that issues are adequate to deserve encouragement to proceed further. *Barefoot*

6   *v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for

7   substituting the word "constitutional" for the word "federal," § 2253 codified the pre-AEDPA standard

8   announced in *Barefoot v. Estelle*).  When, as present here, a district court has rejected constitutional

9   claims on their merits, the COA standard is straightforward.  "The petitioner must demonstrate that

10  reasonable jurists would find the district court's assessment of the constitutional claims debatable or

11  wrong." *Slack*, 529 U.S. at 484.

12  This Court has reviewed the record of this case and finds that reasonable jurists would not find

13  the Court's assessment of the constitutional claims debatable or wrong.  On the merits of this case,

14  reasonable jurists would not debate the constitutionality of Petitioner's conviction and sentence.

15  Accordingly, a certificate of appealability is denied.

16  <u>**CONCLUSION AND ORDER**</u>

17  For the reasons discussed above, the Court DENIES the Second Amended Petition for Writ of

18  Habeas Corpus with prejudice and DENIES the issuance of a certificate of appealability.  The Clerk of

19  Court is ORDERED to enter Judgment for Respondent and to close Case No. CV F 05-00684 LJO GSA

20  HC.

21  IT IS SO ORDERED.

22  **Dated:    November 21, 2008**          /s/ Lawrence J. O'Neill
                                          UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28